IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| | CRIMINAL CASE NO. |
| v. | 1:12-CR-00042-ODE-JFK-1 |
| LINCOLN E. SON, | |
| Defendant. | |

## REPORT AND RECOMMENDATION

Pending before the court is Defendant Lincoln Son's motion [Doc. 27] to suppress evidence obtained on January 20, 2012, during a warrantless traffic stop, motion [Doc. 28] to suppress evidence from a warrantless search of a residence located at 3737 Lake Enclave Way, Atlanta, Georgia, and motion [Doc. 29] to suppress statements made by Defendant following his arrest on January 20, 2012. An evidentiary hearing was held on May 17, 2012, on Defendant's motions to suppress.[1] [Doc. 35]. In his post-hearing brief in support of the motions to suppress, Defendant contends that, following the warrantless traffic stop, his arrest and the search of the vehicle he was operating were not supported by probable cause; that his post-arrest statements are inadmissible because he was not advised of his <u>Miranda</u> rights prior to

---

[1]Citations to the transcript of the hearing are:  (Tr. at ).

interrogation; and that the third-party consent to the search of the residence was coerced and lacking in authority to consent as to his room in the residence. [Doc. 38]. The Government opposes the motions to suppress contending that the traffic stop was lawfully conducted based on both a violation of traffic law and the underlying drug investigation and that there was probable cause for Defendant's arrest and the search of the vehicle; that Defendant was not subjected to interrogation following his arrest; and that Defendant does not have a legitimate expectation of privacy in the residence searched and that, in any event, a valid consent to search was obtained. [Doc. 39]. After consideration of the briefs of the parties and the totality of the circumstances, the court finds that Defendant's motions to suppress should be denied.

## I.  Background Facts

On January 30, 2012, Georgia State Patrol ("GSP") troopers who are part of the Criminal Interdiction Unit ("CID"), which investigates drug trafficking organizations, were asked to assist special agents with the Department of Homeland Security ("DHS") with an investigation involving a package that had been intercepted at the Atlanta airport containing four kilograms of cocaine. (Tr. at 5-7, 16, 47-48). GSP

AO 72A
(Rev.8/82)

Trooper Matt Moorman[2] met with DHS agents the evening of January 20, 2012, and was briefed on the investigation and the plan to make a controlled delivery of the package to the target of the investigation. (Tr. at 7-8, 20). At the briefing, Trooper Moorman was advised that a bag, which he observed at the briefing, had been intercepted after the confidential informant, who the trooper also saw at the meeting, removed the bag from an airplane. That confidential informant was to deliver the bag to the target. The Trooper was also advised that prior to the briefing, the four kilograms of cocaine had been removed from the bag and that four kilograms of "sham" cocaine had been placed in the bag, which was locked. (Tr. at 7, 16, 20-21). The Trooper was provided with a photograph of the target, Defendant Lincoln Son, and he was advised by the special agents that a federal, felony arrest warrant had been issued for Defendant in St. Thomas but that the warrant was not yet entered into the

---

[2]Trooper Moorman has been with the GSP since October 2002 and became a trooper in July 2005. He has numerous hours in training and has conducted tens of thousands of traffic stops. In connection with working in CID, he has training and experience in conducting interviews, interrogations, vehicle searches, drug identification, and evidence collection. Trooper Moorman is also a K-9 handler, having been certified in July 2008 with his K-9, Trooper, and having received yearly certification since that date. (Tr. at 6-7).

computer. (Tr. at 8-9, 33). Trooper Moorman was asked to make a "whisper stop" of Defendant Son's vehicle after the delivery of the bag of sham cocaine.[3] (Tr. at 9).

After the briefing, the trooper remained in contact with the other agents involved in the investigation, including by monitoring the radio communications of the surveillance agents observing the confidential informant and Defendant Son. (Tr. at 8-9, 24-25). The confidential informant, following the briefing, contacted Defendant and advised that he had the package. Defendant selected a location to meet the confidential informant at a restaurant on Central Avenue and Camp Creek Parkway, and DHS special agents set up surveillance at the meet location and surrounding area. (Tr. at 8-9, 22). Trooper Moorman, so as not to be detected by Defendant, parked his marked GSP vehicle out of sight from that location. (Tr. at 9, 23-24). He heard the special agents on surveillance confirm, based on "real time" observations, that the confidential informant arrived and then that Defendant, driving a silver Chrysler, with Georgia license tag WX30WL, arrived and met with the confidential informant. (Tr.

_____

[3]A "whisper stop" is used in investigations to avoid disclosure of the underlying drug investigation and, in this case, to protect the role of the confidential informant. Although the trooper is aware of facts related to the drug investigation, a traffic stop based on a violation of traffic laws is conducted. (Tr. at 9, 39).

4

at 9-10, 25-26, 33).  Surveillance agents also confirmed that Defendant took possession of the bag and that the bag was placed into Defendant's vehicle.  (Tr. at 10, 25-26, 33).

When Defendant left the location, in the silver Chrysler, surveillance agents followed him until Trooper Moorman, who had waited thirty to forty-five seconds before leaving his location to avoid being seen by Defendant, was able to obtain a visual observation of Defendant.  (Tr. at 10, 26-27, 48-49, 80).  Defendant left the meet location and traveled on Camp Creek Parkway into Douglas County where the road name changes to Thornton Road and where the trooper began his observations of Defendant's vehicle.[4]  (Tr. at 26-27).  As the trooper followed Defendant's vehicle, he "observe[d] the vehicle weave over the solid yellow line twice" which is a violation of Georgia law, that is, failure to maintain lane.  (Tr. at 11, 27-28).  Trooper Moorman activated his blue lights, and Defendant stopped on the side of the road.  (Tr. at 11).

The trooper exited his patrol vehicle and approached Defendant's vehicle on the passenger side, speaking with Defendant through the open passenger side window.

---

[4]Shortly after Defendant left the meeting with the confidential informant, he turned off Camp Creek Parkway onto a road leading up hill to an apartment complex. He parked near and facing the main road.  (Tr. at 49, 81, 83).  Several surveillance agents observed Defendant parked at that location, where he remained a few minutes before getting back on the parkway and continuing to head towards Douglas County. (Tr. at 40, 49, 82, 84-85).

AO 72A
(Rev.8/82)

(Tr. at 11). He observed the bag that he had seen at the briefing sitting on the passenger side floor board. (Tr. at 12). The trooper said, "Good evening," identified himself as a GSP trooper, advised Defendant that he was stopped for failing to maintain lane,[5] and asked for Defendant's driver's license. (Tr. at 11-12). When Defendant handed his license to Trooper Moorman, the trooper confirmed that the photograph was the same one as given him at the briefing. (Tr. at 11). In response to Trooper Moorman's inquiry, Defendant advised that the address on the license was correct. (Tr. at 12-13). When asked, Defendant advised that the vehicle belonged to a friend and provided the registration. (Tr. at 12-13). Defendant also stated that he was on his way home from the airport. (Tr. at 13). Trooper Moorman advised Defendant that he was going to issue him a warning and returned to the patrol vehicle to run computer checks and to write out the warning. (Tr. at 13-14, 31-32). During this conversation with Defendant, the Trooper observed that Defendant's hands were

---

[5]The trooper stated that Defendant responded "that he was doing something on his cellphone and that he probably did." (Tr. at 12). The trooper understood Defendant as agreeing that he had failed to maintain lane and explained to Defendant the new laws about texting and driving. (Tr. at 12).

shaking and the heavy rise and fall of his chest, indicating heavy breathing. Defendant

appeared to be under physical, nervous stress.[6] (Tr. at 13, 29-31).

After the trooper completed the computer checks and writing the warning, he

exited the patrol vehicle and asked Defendant to exit his vehicle, which he did from the

driver's side. They stood in front of the patrol vehicle. (Tr. at 14). The trooper

explained that he was issuing Defendant a warning, not a citation, and returned to

Defendant his documents, indicating to Defendant that he was free to leave.[7] (Tr. at

---

[6]The trooper also testified that many motorists are nervous when initially stopped for a traffic violation; however, usually when advised that only a warning will be issued, the nervousness subsides. According to the trooper, even after Defendant was advised that he was only receiving a warning, the nervousness, evidenced by continued heavy breathing, hand movements, and shifting (while standing with the trooper after exiting his vehicle) continued. (Tr. at 29-32, 42-45). Defendant contends that the testimony regarding Defendant's alleged nervousness while standing outside the vehicle is not credible and is refuted by the video of the traffic stop. [Doc. 10]. The court has reviewed the video of the traffic stop (Gov't Ex. A) and noted, contrary to Defendant's contentions, some movements by Defendant as described by the trooper. And, of course, the court could not observe Defendant's demeanor while seated in the vehicle. Whether Defendant's demeanor evidenced to the trained and experienced law enforcement officer atypical nervousness for a normal traffic stop, this court will not second-guess. However, for the purposes of resolving Defendant's motion to suppress, the court will not consider Defendant's alleged nervousness as a factor supporting probable cause for the arrest or the search.

[7]The Government takes issue with Defendant's statement that he was "free to leave." [Doc. 39 at 19 n.6]. However, under the rubric of the "whisper stop" and the understanding that Defendant would have based on the objective facts as he knew them at the time, his belief at the conclusion of the traffic stop that he was free to leave is not

7

14, 32, 34). He then asked Defendant if there was anything illegal in his vehicle, to which Defendant responded, "No." (Tr. at 14). When the trooper asked for consent to search the vehicle, Defendant responded, "No." (Tr. at 15, 34). The trooper explained that he had a K-9 and was going to perform a "free air" search of the exterior of the vehicle. Defendant was not free to leave at that point. (Tr. at 15, 35). When Trooper Moorman deployed his K-9, beginning on the passenger side of the vehicle, Trooper alerted to the driver's side door.[8] (Tr. at 15, 35). Trooper Moorman returned his K-9 to the patrol vehicle and explained to Defendant that he had probable cause to search the vehicle. (Tr. at 15). The trooper found the bag on the front passenger floor board and observed that it was locked. He asked the Defendant if the bag was his, and

---

"specious." The objective facts as known to Defendant would support such a conclusion.

[8]During cross-examination about the alert to the odor of narcotics in the vehicle, Trooper Moorman explained that odors circulate around in the vehicle and may escape the vehicle from a number of seams no matter where the drugs are located in the cab of the vehicle. (Tr. at 35-36). Although the passenger side window may have still been open, because Defendant had recently exited from the vehicle by opening the driver's side door, that fact could explain why the K-9 alerted at that point. (Tr. at 38). Also, although the cocaine that had been in the bag had been replaced with sham cocaine, the trooper believed that there could well be residual odor from the four kilograms of cocaine having been in the bag for a considerable amount of time and that "there is plenty of odor to cook out of that vehicle for the dog to sniff and to alert on." (Tr. at 36).

AO 72A
(Rev.8/82)

Defendant responded, "No." (Tr. at 15). The trooper squeezed the bag, which was smooth-sided, and felt what he believed to be kilogram size packages inside. (Tr. at 15). He placed Defendant under arrest for violation of the Georgia Controlled Substances Act. He did not advise Defendant about the federal arrest warrant. (Tr. at 16, 33-34). A further search of the interior of the vehicle uncovered four to five cellular telephones and miscellaneous paperwork. (Tr. at 16-17). DHS agents who were nearby then took custody of Defendant and of the evidence. (Tr. at 17, 51-52).

After Defendant was transported to the DHS office, Special Agents Harold Hawkins and Roy Rutherford and Task Force Officer ("TFO") Hoopingarner met with Defendant, who was being lodged in a holding cell. (Tr. at 94-95). The agents wanted to speak with Defendant but, having been advised that he had refused to consent to a search of his vehicle, doubted that Defendant would talk to them. They did not advise him of his Miranda rights. (Tr. at 95, 99). Agent Hawkins, therefore, "merely asked him, you know, instead of reading his Miranda warning, I said, look, we have some questions we would like to ask you. However, you know, I don't think you want to talk to me, you probably want to talk to a lawyer or something to that effect or you don't want to talk to us, do you?" (Tr. at 95). Defendant responded, "No, I would like to talk to a lawyer. I am in something over my head." (Tr. at 95). At that point, the

agent only asked questions about where Defendant lived because they were aware that the address on Defendant's license was a business, and they "were trying to ascertain where he actually resided so we could fill out some booking paperwork and other things." (Tr. at 95, 99). The agents also wanted to ask for consent to search his residence. (Tr. at 95, 99).

The agent asked if the information on Defendant's driver license was where he resided, and Defendant responded, "Yes." (Tr. at 96). The agent then asked Defendant, "so that is where you sleep, you stay and sleep at a commercial business?" Defendant stated, "Yes." (Tr. at 96, 97). Based on the investigation, Agent Hawkins knew Defendant had been observed at a residence located at 3737 Lake Enclave Way and at an apartment located on Lee Road in Lithia Springs. He asked Defendant for consent to search both of those residences, and Defendant responded, "How can I give you consent to search when I don't live there?" (Tr. at 96, 96-97). After the agent advised Defendant about the arrest warrant out of St. Thomas, the conversation ended. (Tr. at 96).

Some agents were then asked to go to 3737 Lake Enclave Way to conduct a knock and talk and to attempt to obtain consent to search the residence. (Tr. at 53-54). Special Agent Christopher Wright and TFO Gimwade, along with two GSP troopers

in marked police vehicles, arrived at the residence at approximately midnight. (Tr. at 53-55, 70). Agent Wright knocked on the door several times, and after about four to five minutes, a woman answered the door, asking who they were. (Tr. at 55-56, 70-71). Agent Wright identified himself and presented his credentials. (Tr. at 56-57). He asked if the agents and troopers could step inside to speak with her, and she responded, yes, "come in." The woman, Ms. Harris, stepped back to allow the men inside. (Tr. at 56, 73).

Once inside, Agent Wright explained that they were at the residence as part of an ongoing drug investigation following a GSP traffic stop. (Tr. at 57, 77). Ms. Harris appeared surprised. (Tr. at 57, 71). He asked Ms. Harris who lived in the residence, and she advised that she was not married and lived there with her two children. (Tr. at 57). TFO Gimwade asked about Lincoln Son, and Ms. Harris stated that he was the father of her nine year old son. (Tr. at 57-58, 72). Agent Wright explained that they would like to search the residence. Ms. Harris asked what the agents were looking for, and he responded, drugs, drug paraphernalia and large amounts of currency. (Tr. at 58). Ms. Harris advised that Defendant did not live in the residence but stayed there when visiting his son. When he stayed, he used a room at the top of the stairs. (Tr. at 58, 71). Ms. Harris appeared confused and asked if she was in any trouble, and Agent

11

Wright responded that "as far as [he] knew she hadn't done anything wrong." She did not want to allow a search of the entire residence and asked could she limit the search. (Tr. at 58, 74). The agent responded that she could ask them to leave at any time, and if she did so, they would leave. (Tr. at 59). When Ms. Harris asked if the agents had a warrant, Agent Wright responded clearly that they did not have a warrant and that they were only in the house with her consent. (Tr. at 59, 73). Ms. Harris also stated that she wanted to talk to a lawyer and was told that she could; however, Ms. Harris could only locate an office number. Due to the time of night, she did not try to reach the lawyer and did not want to delay until she could do so.[9] (Tr. at 59, 6773).

Ms. Harris was concerned that the agents were looking for drugs; she did not want drugs left in the residence. (Tr. at 59). She consented to a search of the room in which Defendant stayed when he visited the residence. (Tr. at 59, 62). Agent Wright presented Ms. Harris with a consent to search form, which he explained to her, and she signed. (Tr. at 60, 62; Gov't Ex. C). The form provided in pertinent part:

> I have been informed of my constitutional right not to have a search made of my *residence* without a search warrant.

---

[9]At some point, prior to allowing the search, Ms. Harris left the agents and GSP troopers downstairs and went up to her bedroom to change her clothes. (Tr. at 69, 77-78).

I also have been informed of my right to refuse to consent to the *residence* being searched without a search warrant.

I have been warned that anything discovered during such a search may be used against me in court or other proceedings.

I hereby authorize Special Agents *Wright and other LEO* to conduct a complete search of *3737 Lake Enclave Way Atlanta GA* ~~located at~~ *above* and to take therefrom any letters, papers, materials, information, or other property which they may desire.

I have given this authorization to the above Special Agent(s) voluntarily and without threats, promises, pressure, or coercion of any kind.

(Gov't Ex. C [Italicized Words Handwritten on Form]). Before starting the search, the agent asked Ms. Harris who had access to the room. She advised that Defendant did not live in the residence, that the house was hers, and that she had access to all of the rooms.[10] (Tr. at 63-64). She explained that the door to the room, although having a lock, remained open and that she frequently entered the room to clean. (Tr. at 64). The door to the room was open when the agents went in to search. (Tr. at 64).

Ms. Harris accompanied the agents to the room and stood in the doorway watching. (Tr. at 62, 74-75). Under the bed in the room, the agents found currency, a money counting machine and a box. When the lid of the box was opened, Agent

---

[10]The property records indicated that a Kevin Robinson owned the home. (Tr. at 98).

Wright smelled the odor of marijuana. Inside the box was a vacuum sealer, and on the tray, he observed what appeared to be marijuana and cocaine residue. (Tr. at 62-63, 76). Ms. Harris observed the items and was confused as to what the items were. She was "very surprised" that the agents found the trace amounts of narcotics. (Tr. at 63, 75). Several pairs of mens shoes were also found under the bed. (Tr. at 72). In the dresser, Agent Wright found receipts for the purchase of a boat. (Tr. at 63, 72). The agents then requested permission to search other common areas in the residence to which Defendant had access. Ms. Harris agreed but did not allow a search of her or her children's bedrooms. (Tr. at 64-65). No additional items of evidentiary value were found. (Tr. at 66).

Agent Wright stated that he did not have any difficulty conversing with Ms. Harris and that she did not indicate that she did not understand him. (Tr. at 68). Although she had been sleeping when the agents arrived, she did not appear afraid just startled that they were at her residence. (Tr. at 68). She did not appear to be under the influence of drugs or alcohol, and she was coherent. (Tr. at 69). She never requested that the agents leave the residence. (Tr. at 93).

Additional facts will be set forth as necessary in discussion of the motions to suppress.

14

## II.    Discussion

Defendant seeks to suppress evidence seized as a result of a warrantless search of the vehicle he was operating on January 20, 2012, which also resulted in his arrest, and as a result of a warrantless search of the residence located at 3737 Lake Enclave Way in the early morning hours of January 21, 2012.  As to the search of the vehicle, Defendant contends that the GSP trooper lacked probable cause for the search and for his arrest on drug charges.  The Government responds that, based on all of the information known to the trooper - including the existence of a federal, felony arrest warrant for Defendant, probable cause did support the search and arrest.

With respect to the search of the residence, which was based on the consent of a third party, Defendant contends that the consent was coerced and that the third party lacked authority to consent to the search of the room in which he slept when visiting the residence.  In response, the Government first contends that Defendant lacked a reasonable expectation of privacy in the residence and, therefore, cannot challenge the search.  And, alternatively, the Government contends that the consent was not coerced and was given by a person with full authority to allow the search.

Defendant also challenges the admissibility of the statements that he made following his arrest asserting that he was subjected to interrogation while in custody

15

but was not given and did not waive his <u>Miranda</u> rights. The Government opposes suppression of the statements, while acknowledging that Defendant was in custody and no <u>Miranda</u> rights waiver was obtained, contending that Defendant's statements were not made in response to interrogation but as part of routine booking procedures.

### a. Traffic Stop, Vehicle Search and Arrest

"A traffic stop, which 'is a seizure within the meaning of the Fourth Amendment,' . . . 'is constitutional if it is either based upon probable cause to believe a traffic violation has occurred or justified by reasonable suspicion in accordance with <u>Terry</u>[v. Ohio, 88 S. Ct. 1868 (1968)].'" <u>United States v. Spoerke</u>, 568 F.3d 1236, 1248 (11th Cir. 2009) (citations omitted). As the Eleventh Circuit Court of Appeals stated in <u>United States v. Cooper</u>, 133 F.3d 1394 (11th Cir. 1998), "law enforcement 'may stop a vehicle when there is probable cause to believe that the driver is violating any one of the multitude of applicable traffic and equipment regulations relating to the operation of motor vehicles.'" 133 F.3d at 1398 (quoting <u>United States v. Strickland</u>, 902 F.2d 937, 940 (11th Cir. 1990)); <u>see also</u> <u>United States v. Terry</u>, 220 Fed. Appx. 961, 963 (11th Cir. 2007) (same). And "[w]hen determining whether an officer had probable cause to believe that a traffic violation occurred, the 'officer's motive in making the traffic stop does not invalidate what is otherwise objectively justifiable

behavior under the Fourth Amendment.'"[11]  United States v. Harris, 526 F.3d 1334, 1337 (11th Cir. 2008) (citation omitted); see also United States v. Gonzalez, 2009 WL 243732, at *3 (M.D. Ala. August 7, 2009) (rejecting the defendant's contention that traffic stop for improper or erratic lane change was a pretext to conduct a search for contraband); United States v. Artiles-Martin, 2008 WL 2600787, at *5 (M.D. Fla. June 30, 2008) (the defendant's contention that traffic stop was pretext to conduct search of tractor-trailer foreclosed by Whren).  Accordingly, the fact that the trooper in this case conducted a "whisper stop" does not factor into the reasonableness of making the stop because of the traffic violation.

The GSP Trooper had probable cause to stop Defendant's vehicle on the basis of his observation of a violation of Georgia traffic law, that is, failure to maintain lane. He testified that after obtaining visual surveillance of Defendant, who was traveling on Thornton Road in Douglas County, he "observe[d] the vehicle weave over the solid

---

[11]The law is well established that "'[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.'"  United States v. Jones, 377 F.3d 1313, 1314 (11th Cir. 2004) (quoting Whren v. United States, 116 S. Ct. 1769, 1774 (1996)); see also United States v. McGough, 412 F.3d 1232, 1239 (11th Cir. 2005) (indicating that the magistrate judge had improperly discussed the officers' motives for entering the apartment in resolving the case, the appellate court noted that the test "is an objective one"); United States v. Hernandez, 418 F.3d 1206, 1209 n.4 (11th Cir. 2005) ("[a]n officer's 'subjective intentions' are not relevant for Fourth Amendment analysis").

17

yellow line twice" which is a violation of Georgia law, that is, failure to maintain lane. (Tr. at 10-11, 26-28, 49-50, 80). Trooper Moorman activated his blue lights, and Defendant stopped on the side of the road. (Tr. at 11). These observations established a violation of O.C.G.A. § 40-6-48. See Rayo-Leon v. State, 281 Ga. App. 74, 75, 635 S.E.2d 368, 370 (2006) ("'[w]eaving without reason into nearby lanes violates [OCGA § 40-6-48(1)]' and justifies a stop") (citing inter alia Worsham v. State, 251 Ga. App. 774, 775, 554 S.E.2d 805, 807 (2001) ("officer authorized to initiate traffic stop after observing driver fail to maintain lane")). The traffic stop was lawfully initiated.

And, as noted, law enforcement officers may also briefly detain individuals for purposes of investigating a crime if they have a reasonable, articulable suspicion based on objective facts that the individual has engaged in, or is about to engage in, criminal activity. See Terry, 88 S. Ct. 1868; Harris, 526 F.3d at 1337 (same); United States v. Lindsey, 482 F.3d 1285, 1290 (11th Cir. 2007) (same). "[T]he 'reasonableness' standard requires that a police officer 'be able to point to specific and articulable facts, which, when taken together with rational inferences from those facts, reasonably warrant that intrusion.'"[12] United States v. Mikell, 102 F.3d 470, 474-75 (11th Cir.

[12]And those inferences are considered in light of the training and experience of the agents and troopers conducting the investigation. See Lindsey, 482 F.3d at 1290-91 ("We also recognize that the police may 'draw on their own experience and

1996) (citing Terry, 88 S. Ct. at 1880); see also United States v. Blackman, 66 F.3d 1572, 1576 (11th Cir. 1995) ("The reasonableness of the officers' conduct must be judged against an objective standard:  would the facts available to the officer at the moment of the seizure or search warrant a man of reasonable caution in the belief that the action taken was appropriate.") (citations and internal quotation marks omitted)). Additionally, "[d]uring a lawful traffic stop, officers . . . may take steps that are reasonably necessary to protect their personal safety . . . , including requiring the driver and passengers to exit the vehicle 'as a matter of course.'" Spoerke, 568 F.3d at 1248 (quoting Maryland v. Wilson, 117 S. Ct. 882, 884 (1997); Pennsylvania v. Mimms, 98 S. Ct. 330, 333-34 (1977)).

The legality of traffic stops is analyzed under the test set forth in Terry. "[A] traffic stop 'must last no longer than is necessary to effectuate the purpose of the

---

specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.'") (citation omitted); United States v. Smith, 201 F.3d 1317, 1323 (11th Cir. 2000) ("In deciding whether the detaining officers had reasonable suspicion, we look at the totality of the circumstances known to the detaining officers at the time of the detention[,]" which includes viewing all of the circumstances "in the light of the officers' special training and experience."); United States v. Diaz-Lizaraza, 981 F.2d 1216, 1221 (11th Cir. 1993) ("While none of these actions is criminal on its face, together they did provide the trained agents with reasonable suspicion" that the defendant was involved in criminal activity.).

19

stop.'" United States v. Ramirez, 476 F.3d 1231, 1237 (11th Cir. 2007) (quoting

United States v. Pruitt, 174 F.2d 1215, 1220 (11th Cir. 1999)). Absent articulable

suspicion of other criminal activity, a traffic stop may last no longer than necessary to

process the traffic violation. United States v. Purcell, 236 F.3d 1274, 1277 (11th Cir.

2001). Additionally, "'further questioning unrelated to the initial stop is permissible

if the initial detention has become a consensual encounter.'" Ramirez, 476 F.3d at

1237 (quoting Pruitt, 174 F.3d at 1220).

In Hernandez, 418 F.3d 1206, the Eleventh Circuit Court of Appeals, relying on

the Supreme Court's decision in Muehler v. Mena, 125 S. Ct. 1465 (2005), stated that

the focus in evaluating the reasonableness of a detention during a traffic stop is "on the

duration (and not scope of questioning). . . ."[13] 418 F.3d at 1209 n.3. Accordingly, a

---

[13]The facts in Muehler involved the detention of an individual, Mena, in handcuffs during the execution of a search warrant. While Mena was being detained, officers questioned her about her immigration status. Muehler, 125 S. Ct. at 1471. The Supreme Court rejected the lower court's finding that Mena's Fourth Amendment rights were violated by the questioning, a decision which the lower court apparently based "on the assumption that the officers were required to have independent reasonable suspicion in order to question Mena concerning her immigration status because the questioning constituted a discrete Fourth Amendment event." Id. The Supreme Court found that premise faulty because, as summarized by the Eleventh Circuit Court of Appeals in Hernandez, "'[M]ere police questioning does not constitute a seizure,'" – even if such questioning is about a topic unrelated to the initial purpose of the search or seizure – so long as it does not "'prolong[ ] . . . the time reasonably required to complete that [initial] mission.'" 418 F.3d at 1209 n.3 (quoting Muehler,

AO 72A
(Rev.8/82)

court does "not inquire as to the substantive reasonableness of the questions that are asked by a police officer in the context of a traffic stop, but only whether the 'duration' of the detention was prolonged 'for an unreasonable time.'" Ramirez, 476 F.3d at 1237 n.11 (quoting Hernandez, 418 F.3d at 1209 n.3); see also United States v. Ffriend, 151 Fed. Appx. 778, 779 (11th Cir. 2005) ("Moreover, during a legal stop, an officer may ask questions, including questions not strictly related to the traffic stop, while waiting for a computer check of registration or examining a driver's license.").

The duration of a traffic stop may be prolonged to investigate, by the use of computer checks, the driver's license and the vehicle registration and, for officer's safety, the criminal history of the driver. United States v. Boyce, 351 F.3d 1102, 1106 (11th Cir. 2003)[14]; Purcell, 236 F.3d at 1277-78. Additionally, an officer conducting

---

125 S. Ct. at 1471). The Supreme Court held that because the lower court did not find that questioning Mena about her immigration status extended the duration of her detention, "no additional Fourth Amendment justification for inquiring" about other matters was required. Muehler, 125 S. Ct. at 1471-72 In Hernandez, the Court of Appeals extended the decision in Muehler to apply to lawful traffic stops. 418 F.3d at 1209 n.3.

[14]However, each of these computer checks must be conducted as a routine part of the traffic stop and not undertaken after the conclusion of the traffic stop to further detain a driver absent articulable suspicion of other criminal activity. Boyce, 351 F.3d at 1107 (finding that the criminal history check in that case was not requested until several minutes after the traffic stop had concluded and after the officer had asked for and been refused consent to search the vehicle).

a routine traffic stop may request consent to search the vehicle. <u>Harris</u>, 526 F.3d at 1339; <u>Purcell</u>, 236 F.3d at 1281; <u>United States v. Simmons</u>, 172 F.3d 775, 778 (11th Cir. 1999).

Trooper Moorman also had reasonable suspicion, if not probable cause, to believe that Defendant was engaged in criminal activity at the time of the stop. When Trooper Moorman stopped Defendant, he knew the following information. An individual, whom the trooper had observed earlier in the evening, had retrieved a bag, which the trooper had also observed, from an airplane at the Atlanta airport. (Tr. at 7-8, 20-21, 43). That bag had contained four kilograms of cocaine and was intended to be delivered to Defendant Son, and the trooper was provided with a photograph of Defendant. (Tr. at 7, 9, 12, 16). At the time that the trooper observed the bag, DHS agents had removed the cocaine and substituted four kilograms of sham cocaine for the controlled delivery to Defendant. (Tr. at 16, 21). After the briefing with the agents, the trooper remained in contact with the agents conducting surveillance of the controlled delivery and was advised that the individual cooperating with the agents had contacted Defendant and arranged for the delivery of the bag at a restaurant located on

Central Avenue and Camp Creek Parkway.[15] (Tr. at 8-10, 22, 24-26). As the agents then observed in "real time" the meeting between the cooperating individual and Defendant, the trooper overheard the radio transmissions confirming that the meeting occurred, that Defendant was driving a silver Chrysler with Georgia tag number WX30WL, that Defendant took possession of the bag, and that the bag was placed into the vehicle driven by Defendant. (Tr. at 9-10, 24-27, 33). When Defendant left the meet location, agents conducted surveillance of his movements until the trooper was

---

[15]The facts that form a part of the collective knowledge relied upon to establish a reasonable suspicion to detain and probable cause to arrest Defendant and search the vehicle is not limited to observations relayed in detail to the trooper by other law enforcement personnel involved in the investigation or to observations the trooper personally made during the traffic stop. In United States v. Glinton, 154 F.3d 1245 (11th Cir. 1998), the Eleventh Circuit Court of Appeals rejected a defendant's argument that because the officers effecting the stop of the vehicle in which he was riding did not have personal knowledge establishing a reasonable suspicion of criminal activity, the stop was unlawful. Noting "that reasonable suspicion is determined by the *collective* knowledge of the officers involved in the stop[,]" the court stated, "The fact that the task force officers who ordered the stop by radio had reasonable suspicion to believe [the defendant] was carrying drugs satisfies the Terry requirements for an investigative stop." Id. at 1257 (emphasis in original). See, e.g., United States v. Goddard, 312 F.3d 1360, 1363-64 (11th Cir. 2002) ("Observations and other information supplied by officers involved in a common investigation can, taken together, create probable cause for a search."); United States v. Kapperman, 764 F.2d 786, 791 n.5 (11th Cir. 1985) (although the officer effecting the stop "may not have known all of the facts already uncovered in the investigation[,]" he "was entitled to act on the strength of the radio communication directing him to 'stop the vehicle and secure the scene'").

23

able to personally observe the vehicle and conduct the traffic stop. (Tr. at 10-11, 26-28). This information provided more than sufficient facts to establish a reasonable and articulable suspicion that Defendant was engaged in criminal activity, that is, a conspiracy to possess with intent to distribute a controlled substance or attempted possession of a controlled substance, even without consideration of any of the observations during the traffic stop. These facts justified not only the initial stop but the detention and questioning conducted during the traffic stop, including extending the length of the detention to allow the K-9 to conduct the open air sniff of the vehicle.

The alert by the K-9 and the trooper's personal observation of the bag that he knew contained the sham cocaine delivered to Defendant by the cooperating individual provided, if needed, the necessary additional facts to establish probable cause for Defendant's arrest and the vehicle search.[16] After stopping Defendant, the trooper

---

[16]The court also notes that the trooper was aware, based on the information provided by the DHS agents, that a federal, felony warrant had been issued for Defendant's arrest. (Tr. at 7-8, 33-34). Although the warrant was not in the computer data base at the time of Defendant's arrest, the trooper reasonably relied on the agents' statement to him that the warrant existed which provided an independent basis supporting Defendant's arrest. See, e.g., United States v. Munoz, 150 F.3d 401, 411 n.6 (5th Cir. 1998) (officers not required to possess arrest warrant so long as they "have reliable knowledge of it"); United States v. McCarthy, 77 F.3d 522, 533 (1st Cir. 1996) (a finding, supported by the record, that officers "were aware of an outstanding federal arrest warrant" for the defendant "is a sufficient basis to support the arrest"); United States v. Buckner, 717 F.2d 297, 301 (6th Cir. 1983) (although the arrest warrant was

AO 72A
(Rev.8/82)

approached the vehicle on the passenger side to speak with Defendant and as he looked in that window, he observed the bag that he knew contained the sham cocaine. (Tr. at 11-12, 43). This observation confirmed the information that had been relayed to him concerning the controlled delivery. And, although there is no evidence that Defendant looked inside the bag or that directly establishes that Defendant knew that he accepted delivery of a bag that was supposed to contain four kilograms of cocaine, the circumstantial evidence provides probable cause to arrest Defendant for a drug violation.

In <u>Craig v. Singletary</u>, 127 F.3d 1030 (11th Cir. 1997), the Eleventh Circuit Court of Appeals stated:

> Probable cause to arrest exists when the facts and circumstances within the collective knowledge of law enforcement officers, or of which they have reasonably trustworthy information, would cause a prudent person to believe that the suspect has committed or is committing an offense. . . . Because "sufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment" . . . "probable cause itself is a doctrine of reasonable probability and not certainty[.]"

---

not in hand when the defendant was arrested and was not produced at the suppression hearing, because the officers had reliable knowledge of the warrant's existence, no more was necessary to support arrest); <u>Poindexter v. Wolff</u>, 403 F. Supp. 723, 729 (D. Neb. 1975) (because the arresting officers were informed of the existence of the arrest warrant for defendant, "[t]hat is enough").

AO 72A
(Rev.8/82)

Id. at 1042 (citations omitted); see also Lindsey, 482 F.3d at 1291 ("Probable cause to arrest exists when the totality of the facts and circumstances support 'a reasonable belief that the suspect had committed or was committing a crime.'") (citation omitted). Thus, "[s]ince a finding of probable cause requires only a probability of criminal activity . . . a court assessing probable cause in hindsight must assess both the totality of the circumstances and the inferences that flow from those circumstances." United States v. Wai-Keung, 845 F. Supp. 1548, 1557 (S.D. Fla. 1994), aff'd, 115 F.3d 874 (11th Cir. 1997) (citations omitted). And probable cause "'must be judged not with clinical detachment, but with a common sense view to the realities of normal life.'" Craig, 127 F.3d at 1042 (citation omitted). A law enforcement officer need not resolve all inferences and factual conflicts in favor of the suspect. "An officer's decision to arrest a suspect may be objectively reasonable even though that officer has not specifically discarded every possible non-criminal explanation for the conduct that forms the basis for [the] decision to arrest a suspect." Bailey v. Bd. of Cnty. Comm'rs of Alachua Cnty., Fla., 956 F.2d 1112, 1119 n.5 (11th Cir. 1992).

In arguing that the arrest violated his rights, Defendant notes that there is no evidence that he looked inside the bag, which was locked, or that he felt the bag in such a way as to discern that it contained kilogram-sized objects. Defendant's

26

arguments are not persuasive. In a case involving a controlled delivery, the Eighth Circuit Court of Appeals found that there was probable cause to support a warrantless arrest. In <u>United States v. Sloan</u>, 293 F.3d 1066 (8th Cir. 2002), an individual, Kenneth Johnson, had been intercepted in a bus terminal in Las Vegas by authorities. He was en route to deliver drugs in his possession to Omaha, Nebraska. Mr. Johnson agreed to cooperate by making a controlled delivery. He had been advised by his superiors that "Dave" or his girlfriend would meet him at the bus terminal. <u>Id.</u> at 1067. Defendant Yulunda Sloan arrived at the "bus terminal approximately five minutes after Mr. Johnson arrived, looked around, approached Mr. Johnson, and said, 'let's go,' 'come on,' or words to that effect." <u>Id.</u> Mr. Johnson followed the defendant to a vehicle where she entered the driver's side, and Mr. Johnson entered the passenger side. At this point, agents surrounded the vehicle and arrested both individuals. <u>Id.</u> Evidence seized from the defendant's purse and her post-arrest statements linked her to a David Walker, the intended recipient of the drugs. <u>Id.</u> The court held, in denying the motion to suppress filed by Ms. Sloan:

> In this case, the circumstances leading to Ms. Sloan's arrest, namely, her role in picking up a man whom the police knew was a drug courier, gave the officers probable cause to believe that she had committed a crime, and the officers discovered the note [which was the subject of the motion to suppress] during a search that was incident to a valid arrest.

27

Id. at 1069.  Likewise in this case, Defendant's role in meeting the cooperating individual and taking delivery of a bag that had contained a large quantity of cocaine was sufficient to establish probable cause for his arrest.

And, in United States v. Dickey-Bey, 393 F.3d 449 (4th Cir. 2004), the Fourth Circuit Court of Appeals found probable cause existed to arrest an individual who picked up a sealed package containing a quantity of cocaine from a mail delivery location although there was no direct evidence of the arrestee's knowledge of the contents of the package.  Inferring knowledge of the contents of the package to the arrestee to support a finding of probable cause, the court stated:

> These facts suggest the existence of a careful and clever operation dealing in large quantities of cocaine.  *In assessing probabilities*, an experienced officer would conclude that the person designated to pick up the packages was likewise part of the well-planned operation.  It would have made little sense for a large, sophisticated operation to go to the lengths and organization demonstrated in this case and then casually to commit the pickup of some $200,000 worth of drugs to an unknown, uninformed, and perhaps untrustworthy courier.  To the contrary, such an operation would likely have sent someone known to be trustworthy to pick up the packages. . . .

Id. at 455 (emphasis in original).  Similarly, in United States v. Frazier, 394 F.3d 612 (8th Cir. 2005), the Eighth Circuit Court of Appeals found sufficient evidence to support the conviction of an individual transporting a large quantity of

28

pseudoephedrine although there was no direct evidence of the defendant's knowledge of the contents of the U-Haul truck used to the transport the precursor. Id. at 620-21. The court noted that "[e]ven if [the defendant] did not own the U-Haul or the contents being transported, it is unlikely that the owner would place such a significant amount of pseudoephedrine in the hands of people who do not know it is there." Id. at 621. Similarly, in this case, the agents and the trooper reasonably concluded that a person who took delivery of a bag (whether or not there is direct proof at the time of arrest that he knew the contents of the bag) that was supposed to contain four kilograms of cocaine would be a participant in the criminal activity and that such a delivery would not be made "to an unknown, uninformed, and perhaps untrustworthy courier." Dickey-Bey, 393 F.3d at 455.

There was probable cause to arrest Defendant. And whether there was probable cause to support the warrantless search of the vehicle is an easier question to answer. Although as a general rule, the Fourth Amendment requires police officers to obtain a warrant before conducting a search, see California v. Carney, 105 S. Ct. 2066, 2069 (1985), in Carroll v. United States, 45 S. Ct. 280, 285 (1925), the Supreme Court established an exception to the warrant requirement for searches of automobiles and other moving vehicles. Under the "automobile exception," "[i]f a car is readily mobile

29

and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more." Pennsylvania v. Labron, 116 S. Ct. 2485, 2487 (1996); see also United States v. Tamari, 454 F.3d 1259, 1261 (11th Cir. 2006) (indicating that "readily mobile" means "operational"). No separate exigent circumstances need to be shown. See Maryland v. Dyson, 119 S. Ct. 2013, 2014 (1999); United States v. Watts, 329 F.3d 1282, 1286 (11th Cir. 2003) ("[T]his Court made it 'clear that the requirement of exigent circumstances is satisfied by the ready mobility *inherent* in all automobiles that reasonably appear capable of functioning.'") (quoting United States v. Nixon, 918 F.2d 895, 903 (11th Cir. 1990)) (emphasis in original). There is no dispute that the vehicle was mobile having just been stopped by the trooper while operating on the roadway. (Tr. at 10-11).

The validity of the search, accordingly, turns on whether there was probable cause to believe the vehicle contained contraband or evidence of a crime. Dyson, 119 S. Ct. at 2014; see also Lindsey, 482 F.3d at 1293 ("The key issue here is whether the police had probable cause for the search and seizure of the vehicle."). "Probable cause for a search exists when under the totality of the circumstances there is a fair probability that contraband or evidence of a crime will be found in a particular place."

30

United States v. Magluta, 418 F.3d 1166, 1182 (11th Cir. 2005) (citations and internal quotation marks omitted).

Once the trooper observed the bag, which had contained the four kilograms of cocaine and now contained the sham cocaine, in the front floor board of the vehicle, he had the necessary probable cause to search the vehicle. He knew that evidence linked to the ongoing criminal activity, that is, either a conspiracy to possess cocaine or an attempt to possess a controlled substance, was in the vehicle. The alert by the K-9 provided additional indicia of probable cause.[17] See Nelson, 309 Fed. Appx. at 375; Glinton, 154 F.3d at 1257; and see United States v. Anderson, 367 Fed. Appx. 30, 32 (11th Cir. 2010) ("While a dog sniff must be sufficiently reliable in order to establish probable cause, we have held in dicta 'that training of a dog alone is sufficient proof of reliability.'") (quoting United States v. Sentovich, 677 F.2d 834, 838 n.8 (11th Cir. 1982)). Although Defendant questions the validity of the dog alert given the facts that the alert did not occur on the passenger side of the vehicle where the bag was located and because the cocaine was no longer in the bag, the trooper explained the reasons for the K-9 alerting as he did to the driver's side door and to the residual odor of cocaine.

---

[17]The dog sniff of the exterior of the vehicle did not constitute a search. See United States v. Nelson, 309 Fed. Appx. 373, 375 (11th Cir. 2009); Glinton, 154 F.3d at 1257 (citing United States v. Place, 103 S. Ct. 2637, 2645 (1983)).

AO 72A
(Rev.8/82)

Trooper Moorman explained that odors circulate around in the vehicle and may escape the vehicle from a number of seams no matter where the drugs are located in the cab of the vehicle. (Tr. at 35-36). Although the passenger side window may have still been open, because Defendant had recently exited from the vehicle by opening the driver's side door, that could explain why the K-9 alerted at that point. (Tr. at 38). Also, although the cocaine that had been in the bag had been replaced with sham cocaine, the trooper believed that there could well be residual odor from the four kilograms of cocaine having been in the bag for a considerable amount of time and that "there is plenty of odor to cook out of that vehicle for the dog to sniff and to alert on." (Tr. at 36). The search of the vehicle and the seizure of the bag and the cellular telephones were lawful.

For these reasons, the court finds that Defendant's arrest and the search of the vehicle were both supported by probable cause and **RECOMMENDS** that Defendant's motion [Doc. 27] to suppress evidence from the warrantless search be **DENIED**.

### b.    Statements

Defendant contends that the statements he made following his arrest are not admissible because he was not advised of and did not waive his Miranda rights and

32

because he, in fact, asserted his rights to remain silent and to have an attorney. [Doc. 38 at 13-14]. "Miranda 'warnings are required before any statement may be admitted into evidence at trial which was elicited from a person in custody through interrogation.'"[18] United States v. Adams, 1 F.3d 1566, 1575 (11th Cir. 1993) (quoting Endress v. Dugger, 880 F.2d 1244, 1248 (11th Cir. 1989)). There is no dispute that Defendant was in custody the early morning hours of January 21, 2012, when questioned by Agent Hawkins, due to his arrest on drug charges by Trooper Moorman. And there is no question that the agent did not advise Defendant of his Miranda rights or seek a waiver of those rights prior to speaking with Defendant. In fact, at the agent's invitation, Defendant invoked his Fifth Amendment rights to remain silent and to have an attorney.[19] At the DHS office, Agents Hawkins and Rutherford and TFO

---

[18]See Miranda v. Arizona, 86 S. Ct. 1602, 1630 (1966).

[19]It is not clear if Defendant also attempts to invoke his Sixth Amendment right to an attorney; however, as the Government correctly asserts, the Sixth Amendment does not afford Defendant any additional protection at this stage of the proceedings. See Fellers v. United States, 124 S. Ct. 1019, 1022 (2004) ("We have held that an accused is denied 'the basic protections' of the Sixth Amendment 'when there [is] used against him at his trial evidence of his own incriminating words, which federal agents . . . deliberately elicited from him after he had been indicted and in the absence of his counsel.'") (citation omitted); Brewer v. Williams, 97 S. Ct. 1232, 1239 (1977) ("Whatever else it may mean, the right to counsel granted by the Sixth . . . Amendment[ ] means at least that a person is entitled to the help of a lawyer at or after the time that judicial proceedings have been initiated against him 'whether by way of

Hoopingarner met with Defendant, who was being lodged in a holding cell. (Tr. at 94-95). The agents wanted to speak with Defendant but, having been advised that he had refused to consent to a search of his vehicle, doubted that Defendant would talk to them. They did not advise him of his <u>Miranda</u> rights. (Tr. at 95, 99). Agent Hawkins "merely asked him, you know, instead of reading his Miranda warning, I said, look, we have some questions we would like to ask you. However, you know, I don't think you want to talk to me, you probably want to talk to a lawyer or something to that effect or you don't want to talk to us, do you?" (Tr. at 95). Defendant responded, "No, I would like to talk to a lawyer. I am in something over my head."[20] (Tr. at 95).

---

formal charge, preliminary hearing, indictment, information, or arraignment.'") (citation omitted); <u>Lumley v. City of Dade City, Florida</u>, 327 F.3d 1186, 1195 (11th Cir. 2003) (the filing of a criminal complaint and a subsequent arrest on that complaint does not necessarily trigger a defendant's Sixth Amendment right to counsel).

[20]Defendant does not challenge the admissibility of the statement, "I am in something over my head." [Doc. 38 at 13-14]. And the court finds that the statement is an admissible spontaneous utterance that was not made in response to custodial interrogation. <u>See</u> <u>Cannady v. Dugger</u>, 931 F.2d 752, 754 (11th Cir. 1991) ("Voluntary and spontaneous comments by an accused, even after <u>Miranda</u> rights are asserted, are admissible evidence if the comments were not made in response to government questioning."); <u>United States v. Hendrieth</u>, 922 F.2d 748, 751 (11th Cir. 1991) ("When a defendant deliberately chooses to initiate or continue a conversation, . . . the statements violate neither the Fifth Amendment right against self-incrimination nor the Sixth Amendment right to counsel."); <u>United States v. Hall</u>, 716 F.2d 826, 830 (11th Cir. 1983) ("A district court need not suppress spontaneous remarks which are not the product of 'interrogation.'").

34

A finding that a defendant is in custody and has not waived his <u>Miranda</u> rights is only the first prong of the analysis. Defendant must also be subjected to interrogation. The Supreme Court has held that routine booking questions constitute an exception to the requirement that <u>Miranda</u> rights be given prior to the questioning of a defendant in custody. <u>See</u> <u>Pennsylvania v. Muniz</u>, 110 S. Ct. 2638, 2650 (1990). The Eleventh Circuit Court of Appeals, accordingly, has held that "[a]n officer's request for 'routine information for booking purposes is not an interrogation under <u>Miranda</u>, even though that information turns out to be incriminating.'" <u>United States v. Sweeting</u>, 933 F.2d 962, 965 (11th Cir. 1991) (quoting <u>United States v. Sims</u>, 719 F.2d 375, 378-79 (11th Cir. 1983) (*per curium*)); <u>see also</u> <u>United States v. Guiterrez</u>, 92 F.3d 468, 471 (7th Cir. 1996) ("Prior to or after arresting a suspect, law enforcement officers may ask preliminary questions as to identity, but they may not conduct a custodial interrogation.").

In this case, after Defendant invoked his rights, Agent Hawkins only asked questions about where Defendant lived because they were aware that the address on Defendant's license was a business, and they "were trying to ascertain where he actually resided so we could fill out some booking paperwork and other things." (Tr. at 95, 99). Specifically, the agents wanted to ask for consent to search his residence.

(Tr. at 95, 99). The agent asked if the information on Defendant's driver license was where he resided, and Defendant responded, "Yes." (Tr. at 96). The agent then asked Defendant, "so that is where you sleep, you stay and sleep at a commercial business?" Defendant stated, "Yes." (Tr. at 96, 97). Based on the investigation, Agent Hawkins knew Defendant had been observed at a residence located at 3737 Lake Enclave Way and at an apartment located on Lee Road in Lithia Springs. He asked Defendant for consent to search both of those residences, and Defendant responded, "How can I give you consent to search when I don't live there?" (Tr. at 96, 96-97).

Defendant focuses on the fact that the agents were trying to determine where Defendant lived in order to ask for consent to search, as well as to complete the booking paperwork, as the basis for finding that Defendant was subjected to custodial interrogation. [Doc. 38 at 13-14]. However, the court finds that the questions concerning Defendant's residence were not intended to seek incriminating information but were asked for the legitimate purpose of determining where Defendant lived, not only for booking purposes, but to determine from whom consent should be obtained to search the locations known to the agents. Courts have found that an officer's seeking and subsequent use of this type of information under similar circumstances does not constitute interrogation.

AO 72A
(Rev.8/82)

In <u>United States v. Knope</u>, 655 F.3d 647 (7th Cir. 2011), after the defendant was arrested for using a computer to facilitate a child sex crime, and before being advised of his <u>Miranda</u> rights, the arresting officer asked defendant for his name, age, date of birth and address. <u>Id.</u> at 651-52. The defendant objected to the admissibility of his response to the question about his address claiming "the admission of biographical information that was later used to execute a search warrant of his residence" violated his rights. <u>Id.</u> at 652. The defendant contended "that the question 'Where do you live?' was a form of interrogation because his answer provided the likely location of the computer that he had used for the online chats." <u>Id.</u> The court rejected the defendant's arguments finding that there was no evidence the officer was seeking an admission and that the defendant cited to "no precedent where revealing one's place of residence during booking, thereby identifying a place to search, was found sufficient to invoke <u>Miranda</u>." <u>Id.</u>; <u>see also</u> <u>United States v. King</u>, 165 F.3d 29 (6th Cir. 1998) (unpublished) (following the defendant's arrest and after some hesitation, the defendant finally provided his address to arresting officers which was then legitimately used, as found by the court, as a basis for obtaining a search warrant for the location); <u>United States v. Askew</u>, 2012 WL 369539, at *2 (W.D. Ky. February 3, 2012) (the defendant challenged the use of his cellular telephone number, which was obtained

37

during post-arrest booking inquiries, by arresting officers to investigate his involvement in drug trafficking activities asserting that the use made his statement incriminatory; however, the court rejected his argument and stated, "[s]uch use of biographical information for investigative purposes does not render the gathering of the information an impermissible interrogation"); United States v. Williams, 2010 WL 4919487, at *8 (E.D. Wis. November 2, 2010) (noting that "routine questions about ownership of property are often necessary to enable the police to determine whom they should ask for consent to search the property or whether the property should be returned to another person rather than being inventoried as the prisoner's property when the arrestee is booked into jail" and that, "[i]n such contexts, questions about ownership of property do not constitute interrogation").

In this case, nothing before the court indicates that the agents were seeking incriminating evidence when questioning Defendant about his residence. Instead, knowing that the address on Defendant's driver's license was a commercial establishment, and quite likely not his residence, the agents sought to obtain the address where Defendant lived not only for booking purposes but to ascertain from whom consent needed to be obtained to conduct any searches of the residences

previously associated with Defendant. The questions, under these circumstances, did not constitute interrogation.

For these reasons, the court **RECOMMENDS** that Defendant's motion [Doc. 29] to suppress statements be **DENIED**.

### c. Warrantless Search of 3737 Lake Enclave Way

Defendant contends that the evidence seized pursuant to the warrantless consent search at 3737 Lake Enclave Way should be suppressed because the consent from the third party, Ms. Harris, was coerced and because Ms. Harris did not have authority to consent to the search of the room he used at the residence. [Doc. 38 at 14-15]. The Government first asserts that Defendant lacks a reasonable expectation of privacy in the residence and, therefore, cannot challenge the search. [Doc. 39 at 27-34]. However, if Defendant does have the right to challenge the search, the Government argues that Ms. Harris's consent was voluntary and that she had authority to consent to the search. [Id. at 34-37].

### 1. Legitimate Expectation of Privacy

To determine whether an individual may challenge a search, the court must decide "whether the individual maintains a legitimate expectation of privacy in the object of the search." United States v. Hastamorir, 881 F.2d 1551, 1559 (11th Cir.

1989). It is Defendant's burden to prove that he has a legitimate expectation of privacy in the object of the search, that is, the residence - or any place inside the residence - on January 20 and 21, 2012. See Cooper, 203 F.3d at 1283-84. Making this determination involves a two-part inquiry: (1) "whether the individual has manifested 'a subjective expectation of privacy in the object of the challenged search[,]' . . . [and (2)] whether society is willing to recognize the individual's expectation of privacy as legitimate." Hastamorir, 881 F.2d at 1559 (citation omitted). In this regard, "[t]he Supreme Court has held that '[a] person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed.'" United States v. Brown, 743 F.2d 1505, 1506 (11th Cir. 1984) (quoting Rakas v. Illinois, 99 S. Ct. 421, 425 (1978)). Thus, "'in order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable. . . .'" United States v. Chaves, 169 F.3d 687, 690 (11th Cir. 1999) (citation omitted). In other words, "Fourth Amendment rights are personal and may not be vicariously asserted." Lenz v. Winburn, 51 F.3d 1540, 1549 (11th Cir. 1995).

40

With respect to a location such as the residence in this case, ownership, while a factor to be considered, is not dispositive of this issue. See Chaves, 169 F.3d at 690; Ramos, 12 F.3d at 1023. "[E]ven where a defendant does not own the property searched, he or she may nonetheless have a reasonable expectation of privacy in that place by virtue of his or her relationship with that place." Chaves, 169 F.3d at 690. For example, the Supreme Court has held that a person, such as an overnight guest in a house of a third party, has a reasonable expectation of privacy. Minnesota v. Olson, 110 S. Ct. 1684, 1687-90 (1990). However, as the Court has affirmed, not everyone "who is merely present with the consent of the householder" may necessarily be able to challenge a search of the premises. Minnesota v. Carter, 119 S. Ct. 469, 473 (1998) (citing Rakas, 99 S. Ct. 421). In Carter, the Supreme Court in fact declined to find that a visitor to a residence, present for only a short period of time and for the purpose of conducting illicit drug transactions, without any known prior connection to the residence, had a reasonable expectation of privacy to contest a search of the residence. Id. at 473-74. And "[a] person who occupies premises jointly with another has a reduced expectation of privacy since he assumes the risk that his house-mate may engage in conduct that authorizes entry into the premises." United States v. Lovelock,

41

170 F.3d 339, 345 (2nd Cir. 1999) (citing <u>United States v. Matlock</u>, 94 S. Ct. 988, 993 n.4 (1974)).

Defendant has not established that he had a subjective expectation of privacy in the residence at the time of search. On January 20 and 21, 2012, when asked about his residence, Defendant identified the address on his driver's license, although a commercial location, as the place where he slept and stayed. (Tr. at 96, 97). When asked for consent to search the residence at 3737 Lake Enclave Way, he responded, "How can I give you consent to search when I don't live there?" (Tr. at 96, 96-97). These statements evidence a lack of a subjective expectation of privacy in the residence.

Defendant also failed to present evidence that any expectation of privacy in the residence, even the room where he sometimes slept when visiting, was objectively reasonable. Defendant did not live at the residence or have any ownership interest in the property. (Tr. at 57-58, 63, 97-98). Accordingly, he must show "'an unrestricted right of occupancy or custody and control of the premises as distinguished from occasional presence on the premises as a mere guest or invitee.'" <u>United States v. Campbell</u>, 434 Fed. Appx. 805, 810 (11th Cir. 2011) (quoting <u>United States v. Baron-Mantilla</u>, 743 F.2d 868, 870 (11th Cir. 1984)); <u>see also</u> <u>United States v. Miller</u>, 387 Fed.

42

170 F.3d 339, 345 (2nd Cir. 1999) (citing <u>United States v. Matlock</u>, 94 S. Ct. 988, 993 n.4 (1974)).

Defendant has not established that he had a subjective expectation of privacy in the residence at the time of search. On January 20 and 21, 2012, when asked about his residence, Defendant identified the address on his driver's license, although a commercial location, as the place where he slept and stayed. (Tr. at 96, 97). When asked for consent to search the residence at 3737 Lake Enclave Way, he responded, "How can I give you consent to search when I don't live there?" (Tr. at 96, 96-97). These statements evidence a lack of a subjective expectation of privacy in the residence.

Defendant also failed to present evidence that any expectation of privacy in the residence, even the room where he sometimes slept when visiting, was objectively reasonable. Defendant did not live at the residence or have any ownership interest in the property. (Tr. at 57-58, 63, 97-98). Accordingly, he must show "'an unrestricted right of occupancy or custody and control of the premises as distinguished from occasional presence on the premises as a mere guest or invitee.'" <u>United States v. Campbell</u>, 434 Fed. Appx. 805, 810 (11th Cir. 2011) (quoting <u>United States v. Baron-Mantilla</u>, 743 F.2d 868, 870 (11th Cir. 1984)); <u>see also</u> <u>United States v. Miller</u>, 387 Fed.

42

Appx. 949, 951 (11th Cir. 2010) ("because Miller was neither the owner nor the lessee of the rental home, he must 'demonstrate a significant and current interest' in the property at the time it was searched") (quoting <u>United States v. Garcia</u>, 741 F.2d 363, 366 (11th Cir. 1984)).  The facts before the court fail to support such a finding.

Although Defendant was the father of the one of the children residing at the residence and was a visitor to the residence, sometimes staying overnight in the room searched by the agents (Tr. at 57-58, 63-64, 71-72), Defendant failed to present any evidence indicating when he last visited the residence or that he had any custody or control over even the room he had slept in or the right to exclude others from the room. In fact, the evidence established that the room remained un-locked, that the door to the room remained open, and that Ms. Harris regularly entered the room.  (Tr. at 58, 63-64).  And, while the evidence arguably established that Defendant kept some belongings in the room (Tr. at 65, 71-72, 93), that fact (especially in light of the Defendant's failure to claim any of the seized items as his property) is insufficient to establish that he had a legitimate expectation of privacy in the room or with respect to the items, which appeared to be contraband or evidence of a crime, seized on January 20 and 21, 2012.  <u>Chaves</u>, 169 F.3d 690 (a claim that an individual has an interest in the items seized during a search, however, is insufficient to establish his Fourth

Amendment rights were implicated by a search); United States v. Huerta, 2009 WL 5065694, at **1-2 (E.D. Tenn. December 19, 2009) (finding that the defendant's use of the trailer as a storage bin for his marijuana "did not give him a reasonable expectation of privacy," the court noted that "[s]ociety is not prepared to accept as legitimate an expectation of privacy that is based solely upon the storage of illegal contraband," given a lack of ownership interest in the property).[21]

For these reasons, the court agrees with the Government that Defendant lacked a reasonable expectation of privacy in the residence located at 3737 Lake Enclave Way and, therefore, cannot challenge the warrantless search of that residence.

## 2.     Consent Search

However, assuming *arguendo* that Defendant could establish a reasonable expectation of privacy in the residence, the court finds that Ms. Harris' consent to search was voluntary and that she had authority to consent to the search of the entire residence. "It has been long recognized that police officers, possessing neither reasonable suspicion nor probable cause, may nonetheless search [a residence] without

---

[21]Defendant's reliance on the Supreme Court's decision in Soldal v. Cook County, 113 S. Ct. 538 (1992), is misplaced. [Doc. 38 at 4]. The court adopts the analysis by District Court Judge Timothy Batten and Magistrate Judge Alan Baverman in United States v. Bushay, 2012 WL 878493, at **7-10 (N.D. Ga. March 12, 2012), to distinguish the facts in Soldal from the facts herein.

AO 72A
(Rev.8/82)

a warrant so long as they first obtain the voluntary consent [for the search]." United States v. Blake, 888 F.2d 795, 798 (11th Cir. 1989) (citing Schneckloth v. Bustamonte, 93 S. Ct. 2041 (1973)). "Whether a suspect voluntarily gave consent to a search is a question of fact to be determined by the totality of the circumstances." Id. at 798 (citing Schneckloth, 93 S. Ct. at 2059); see also United States v. Nuyens, 17 F. Supp. 2d 1303, 1306 (M.D. Fla. 1998) ("Voluntariness of consent is a question of fact, and the Court must look to the totality of the circumstances."). "The government bears the burden of proving both the existence of consent and that the consent was not a function of acquiescence to a claim of lawful authority but rather was given freely and voluntarily." Blake, 888 F.2d at 798 (citing United States v. Massell, 823 F.2d 1503, 1507 (11th Cir. 1987)); see also Purcell, 236 F.3d at 1281 ("A consensual search is constitutional if it is voluntary; if it is the product of an 'essentially free and unconstrained choice.'") (citation omitted).

As the Eleventh Circuit Court of Appeals affirmed in United States v. Acosta, 363 F.3d 1141 (11th Cir. 2004), "determining whether consent was 'voluntary is not susceptible to neat talismanic definitions; rather, the inquiry must be conducted on a case-by-case analysis.'" Id. at 1151 (quoting Blake, 888 F.2d at 798). Factors in assessing voluntariness include: "'voluntariness of the defendant's custodial status, the

45

presence of coercive police procedure, the extent and level of the defendant's cooperation with police, the defendant's awareness of his right to refuse to consent to the search, the defendant's education and intelligence, and, significantly, the defendant's belief that no incriminating evidence will be found.'" Blake, 888 F.2d at 798 (citations omitted); see also Purcell, 236 F.3d at 1281 (same).

However, "the government need not establish [defendant's] knowledge of the right to refuse consent 'as the *sine qua non* of effective consent.'" United States v. Zapata, 180 F.3d 1237, 1241 (11th Cir. 1999) (quoting Ohio v. Robinette, 117 S. Ct. 417, 421 (1996)); accord United States v. Brown, 223 Fed. Appx. 875, 880 (11th Cir. 2007) ("the government is not required to prove that the defendant knew he had the right to refuse consent, and a defendant's lack of knowledge of this right is not dispositive, but is just one factor to consider in evaluating the totality of the circumstances"); United States v. Pineiro, 389 F.3d 1359, 1366 n.4 (11th Cir. 2005) ("To the extent Pineiro suggests that the police were required to be more specific in advising him of his rights, and were required to tell him he had a right to refuse consent, this Court has squarely rejected this argument."). And, contrasting the test for the waiver of "rights that protect a fair criminal trial and the rights guaranteed under the Fourth Amendment," Schneckloth, 93 S. Ct. at 2055, the Supreme Court explained

46

that, while a consent to search must be voluntary, it need not be "'an intentional relinquishment or abandonment of a known right or privilege,'" that is, knowing and intelligent. Id. at 2055-56 (citation omitted); see also Tukes v. Dugger, 911 F.2d 508, 516 (11th Cir. 1990) (same). "'[T]he absence of intimidation, threats, abuse (physical or psychological), or other coercion is a circumstance weighing in favor of up-holding what appears to be a voluntary consent.'" United States v. Alim, 256 Fed. Appx. 236, 239 (11th Cir. 2007) (quoting United States v. Jones, 475 F.2d 723, 730 (5th Cir. 1973)).

The totality of the circumstances in this case demonstrate that Ms. Harris' consent to search the residence was voluntary. Two agents, accompanied by two uniform GSP troopers, arrived at the residence at approximately midnight and knocked on the door. Eventually Ms. Harris, who apparently had been sleeping, answered the door. (Tr. at 53-56, 70-71). After Agent Wright identified himself, he asked to step inside to speak with Ms. Harris, and she invited the law enforcement officers inside. (Tr. at 56, 73). In response to Ms. Harris' question why the agents and troopers were at her residence, Agent Wright explained about the earlier GSP traffic stop and inquired who resided in the residence. (Tr. at 57, 77). When Defendant's name was mentioned, Ms. Harris explained that Defendant was the father of one of her children and sometimes stayed overnight in one of the rooms when visiting the child. (Tr. at

47

57-58).  Agent Wright then asked for consent to search the residence and, in response to Ms. Harris' question about what the agent was looking for, advised that they wanted to search for drugs, drug paraphernalia and currency.  (Tr. at 58, 73).

Ms. Harris continued to make inquiries about the request to search, such as, if she was in any trouble, did the agent have a search warrant, and could she limit the search.  (Tr. at 58-59, 73).  Agent Wright advised Ms. Harris that she was not in trouble, that he did not have a warrant, and that they were only in the residence with her permission and she could ask them to leave at any time.  (Tr. at 58-59, 74).  In fact, Ms. Harris, desiring to change her clothes, left the agents and troopers downstairs while she went, unescorted, to change.  (Tr. at 69, 77-78).  Ms. Harris also indicated a desire to contact a lawyer and was advised that she could do so; however, she made the decision - due to the hour - not to make the attempt.  (Tr. at 59, 67, 73).

After satisfying herself and having her questions answered, Ms. Harris consented to a limited search, that is, of the room in which Defendant had previously stayed and then, after the items were found in that room, the common areas in the home.  She signed a consent to search form.  (Tr. at 59-60, 62, 65; Gov't Ex. C).  Ms. Harris accompanied the law enforcement officers to the room used by Defendant and watched as they conducted the search, inquiring about the items found under the bed.

48

(Tr. at 62-63, 74-75). Agent Wright stated that Ms. Harris, although initially surprised and confused, did not have any difficulty understanding and comprehending what was happening and did not appear to be under the influence of drugs or alcohol. (Tr. at 58, 68-69).

Applying the factors set forth in <u>Blake</u> to these facts supports a finding of voluntary consent. Ms. Harris was not in custody or even being detained; nothing in these circumstances indicated any coercive behavior by the law enforcement officers; after Ms. Harris had her questions answered, she was fully cooperative; she was aware that she could refuse to consent and could ask the agents and troopers to leave her residence; she appeared intelligent and understood her rights, as evidenced by her questions about the search warrant and contacting a lawyer; and she had no reason believe that anything would be found that would incriminate her in any illegal conduct. 888 F.2d at 798. Contrary to Defendant's contention, Ms. Harris' questions and understanding that she could limit - including the fact that she did limit the scope of the search (Tr. at 60, 65) - was not evidence of a coerced consent but of a consent given freely after careful consideration of the information provided by Agent Wright. The facts establish that Ms. Harris was not intimidated or afraid of the agents and troopers. She controlled their actions within her home.

49

And Defendant's contention that Ms. Harris did not have authority to consent to the search of the room in which he had slept is meritless. As the Seventh Circuit Court of Appeals stated, "A third party with common authority over the premises [or effects] sought to be searched may provide such consent. . . . Common authority is based upon mutual use of property by persons generally having joint access or control." United States v. Aghedo, 159 F.3d 308, 310 (7th Cir. 1998) (citations omitted); accord United States v. Fernandez, 58 F.3d 593, 597-98 (11th Cir. 1995). As noted by the Supreme Court, "[c]ommon authority is, of course, not to be implied from the mere property interest a third party has in the property . . . but rests rather on the mutual use of the property by persons generally having joint access or control for most purposes. . . ." Matlock, 94 S. Ct. at 993 n.7; see also United States v. Backus, 349 F.3d 1298, 1299 (11th Cir. 2003) (same). Furthermore, "a warrantless entry is valid when based upon the consent of a third party whom the police, at the time of entry, reasonably believed possessed common authority over the premises, even if the third party does not in fact possess such authority." Fernandez, 58 F.3d at 597; see also United States v. Brazel, 102 F.3d 1120, 1148 (11th Cir. 1997). "As with other factual determinations bearing upon search and seizure, determination of consent to enter must 'be judged against an objective standard: would the facts available to the officer at the

50

moment . . . warrant a man of reasonable caution in the belief" that the consenting party had authority over the premises?" <u>Illinois v. Rodriguez</u>, 110 S. Ct. 2793, 2801 (1990) (quoting <u>Terry</u>, 88 S. Ct. at 1880); <u>see also</u> <u>United States v. Mercer</u>, 541 F.3d 1070, 1074 (11th Cir. 2008) (same). Furthermore, as recently affirmed by the Eleventh Circuit Court of Appeals in <u>United States v. Garcia-Jaimes</u>, 484 F.3d 1311 (11th Cir. 2007), <u>vacated and remanded on other grounds</u>, <u>Nunez-Virraizabal v. United States</u>, 128 S. Ct. 2901 (2008), "even if the consenting party does not in fact have the requisite relationship to the premises, if the officer has an objectively reasonable, though mistaken, good-faith belief that the consent was a valid consent, there is no Fourth Amendment violation." <u>Id.</u> at 1323. It is the Government's burden to establish that Ms. Harris had actual authority or apparent authority to consent to the searches. <u>See</u> <u>Rodriguez</u>, 110 S. Ct. at 2797.

The facts establish that Ms. Harris had actual authority to consent to the search on January 20 and 21, 2012. Based on questioning by Agent Wright, he knew that Ms. Harris, who was single, resided in the residence with her children and that Defendant, who had visited previously, would sleep in one of the rooms in the residence but that he was not a resident. (Tr. at 56–58). Ms. Harris also advised that she had full access to the room and that she was frequently in and out of the room. Although there was

51

a lock on the door to the room, the door remained open and was, in fact, open at the time the agents and troopers were in the residence. (Tr. at 63-64). Although Defendant had left some items in the residence, he apparently did not obtain Ms. Harris' permission to store the items found under the bed, including the currency counting machine and vacuum sealer, because Ms. Harris did not know what those items were and she was surprised to find the items in her residence. (Tr. at 62-63, 74-75, 93). These facts, objectively considered, would "'warrant a man of reasonable caution in the belief' that the consenting party had authority over the premises . . ." to consent to the search. Rodriguez, 110 S. Ct. at 2801. As stated by the Eighth Circuit Court of Appeals:

> Where a third party appears to have authority over the entire premises, the police may rely on that person's consent to search throughout the house, so long as the consent appeared to extend so far. . . . "To the extent a person wants to ensure that his possessions will be subject to a consent search due to his *own* consent, he is free to place these items in an area over which others do *not* share access and control, be it a private room or a locked suitcase under his bed."

United States v. Almeida-Perez, 549 F.3d 1162, 1172 (8th Cir. 2008) (quoting Georgia v. Randolph, 126 S. Ct. 1515, 1535 (2006) (Roberts, C.J., dissenting)) (emphasis in original). Defendant did not take such precautions in this case, he neither placed the

items seized by the agents in a private room or in locked containers. Ms. Harris had the authority to consent to the search.

For these reasons, the court **RECOMMENDS** that Defendant's motion [Doc. 28] to suppress the search at 3737 Lake Enclave Way be **DENIED**.

## III. Conclusion

Based on the foregoing cited authority and for the reasons stated, the court **RECOMMENDS** that Defendant's motions [Docs. 27, 28, 29] to suppress be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, declared Ready for Trial.

**SO ORDERED AND RECOMMENDED THIS** 15th day of August, 2012.

JANET F. KING
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/82)