FILED IN CHAMBERS
U.S.D.C. - Atlanta

OCT 0 2 2012

James N. Hatten, Clerk
By: /s/ AM Cauill
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| | CRIMINAL CASE NO. |
| v. | 1:12-CR-42-ODE-JFK |
| LINCOLN E. SON | |

ORDER

This criminal case comes before the Court on objections [Doc. 44] filed by Defendant Lincoln E. Son ("Defendant") to a Report and Recommendation ("R&R") entered on August 15, 2012, by United States Magistrate Judge Janet F. King [Doc. 40]. Magistrate Judge King recommended this Court deny Defendant's motions to suppress evidence from a warrantless traffic stop, to suppress evidence from a warrantless search of a residence, and to suppress statements made by Defendant following his arrest [Docs. 27, 28, & 29] and certified this case ready for trial [Doc. 40 at 53].

For the following reasons, Defendant's objections to the R&R [Doc. 44] are OVERRULED IN PART, and the R&R [Doc. 40] is ADOPTED IN PART and REJECTED IN PART. As a result, Defendant's motion to suppress statements made in custody [Doc. 29] is GRANTED IN PART and DENIED IN PART, and Defendant's motions to suppress evidence from the warrantless traffic stop and to suppress evidence from the warrantless search of a residence [Docs. 27 & 28] are DENIED.

I.  Background[1]

On January 30, 2012, Georgia State Patrol troopers belonging to the Criminal Interdiction Unit, which investigates drug trafficking organizations, were asked to assist special agents with the Department of Homeland Security ("Homeland Security") with an investigation involving a package that had been intercepted at the Atlanta airport containing four kilograms of cocaine [Tr. at 5-7, 16, 47-48].[2] Georgia State Patrol Trooper Matt Moorman[3] met with Homeland Security agents the evening of January 20, 2012, and was briefed on the investigation and the plan to make a controlled delivery of the package to the target of the investigation, Defendant Lincoln Son [Tr. at 7-8, 20]. At the briefing, Homeland Security agents advised Trooper Moorman that a bag, which he observed at the briefing, had been intercepted after a confidential informant, whom the trooper also saw at the meeting, removed the bag from an airplane. This confidential

---

[1] Magistrate Judge King held an evidentiary hearing on the instant motions on May 17, 2012. The Court adopts this background and facts as found by Magistrate Judge King in the R&R, noting and addressing any objections asserted by Defendant to those facts as the Court proceeds.

[2] References to the evidentiary hearing transcript are cited as "Tr. at" page number. The transcript is Doc. 35 on the docket.

[3] Trooper Moorman has been with the Georgia State Patrol since October 2002 and became a trooper in July 2005. He has numerous hours in training and has conducted tens of thousands of traffic stops. In connection with working in CID, he has training and experience in conducting interviews, interrogations, vehicle searches, drug identification, and evidence collection. Trooper Moorman is also a K-9 handler, having been certified in July 2008 with his K-9, and having received yearly certification since that date [Tr. at 6-7].

2

informant was to deliver the bag to Defendant. The agents further advised Moorman that, prior to the briefing, the four kilograms of cocaine had been removed from the bag and replaced with four kilograms of "sham" cocaine, and the bag locked [Tr. at 7, 16, 20-21]. The agents then provided Moorman with a photograph of the target, Defendant, and advised him that a federal felony arrest warrant had been issued for Defendant in St. Thomas but that the warrant was not yet entered into the computer [Tr. at 8-9, 33]. Moorman was asked to make a "whisper stop"[4] of Defendant's vehicle after the delivery of the bag of sham cocaine [Tr. at 9].

After the briefing, Trooper Moorman remained in contact with the other agents involved in the investigation, including by monitoring the radio communications of the surveillance agents observing the confidential informant and Defendant Son [Tr. at 8-9, 24-25]. Following the briefing, the confidential informant contacted Defendant and advised that he had the package. Defendant selected a location to meet the confidential informant-- a restaurant on Central Avenue and Camp Creek Parkway--and Homeland Security special agents set up surveillance at the meet location and surrounding area [Tr. at 8-9, 22]. Moorman, so as to avoid detection by Defendant, parked his marked Georgia State Patrol vehicle out of sight from that location [Tr. at 9, 23-24]. Over the radio, he heard the special agents on surveillance

---

[4]A "whisper stop" is used in investigations to avoid disclosure of the underlying drug investigation and, in this case, to protect the role of the confidential informant. Although the trooper is aware of facts related to the drug investigation, the traffic stop conducted is based on a violation of traffic laws [Tr. at 9, 39].

3

confirm, based on "real time" observations, that the confidential informant had arrived, and then that Defendant, driving a silver Chrysler with Georgia license tag WX30WL, arrived and met with the confidential informant [Tr. at 9-10, 25-26, 33]. Surveillance agents also confirmed Defendant took possession of the bag and the bag was placed into Defendant's vehicle [Tr. at 10, 25-26, 33].

When Defendant left the meet location in the silver Chrysler, surveillance agents followed him until Trooper Moorman, who had waited 30-45 seconds before leaving his location to avoid being seen by Defendant, obtained a visual observation of Defendant [Tr. at 10, 26-27, 48-49, 80]. After Defendant left the meet location he traveled on Camp Creek Parkway into Douglas County where the road name changes to Thornton Road and where Moorman began his observations of Defendant's vehicle [Tr. at 26-27]. As the trooper followed Defendant's vehicle, he "observe[d] the vehicle weave over the solid yellow line twice" which is a violation of Georgia law, that is, failure to maintain lane [Tr. at 11, 27-28]. Moorman activated his blue lights, and Defendant stopped on the side of the road [Tr. at 11].

Trooper Moorman exited his patrol vehicle and approached Defendant's vehicle on the passenger side, speaking with Defendant through the open passenger side window [Tr. at 11]. He observed the bag he had seen at the briefing sitting on the passenger side floorboard [Tr. at 12]. Moorman said, "Good evening," identified himself as a Georgia State Patrol trooper, advised Defendant that

4

he was stopped for failing to maintain lane,[5] and asked for Defendant's driver's license [Tr. at 11-12]. When Defendant handed his license to Moorman, the trooper confirmed the photograph was the same one he was given at the briefing [Tr. at 11]. In response to Moorman's inquiry, Defendant advised that the address on the license was correct [Tr. at 12-13]. When asked, Defendant stated the vehicle belonged to a friend and provided the registration [Tr. at 12-13]. Defendant also stated he was on his way home from the airport [Tr. at 13].

Trooper Moorman advised Defendant he was issuing him a warning and returned to the patrol vehicle to run computer checks and to write out the warning [Tr. at 13-14, 31-32]. During this conversation with Defendant, Moorman observed that Defendant's hands were shaking and the heavy rise and fall of his chest, indicating heavy breathing. Defendant appeared to be under physical, nervous stress[6] [Tr. at 13, 29-31].

After the trooper completed the computer checks and writing the warning, he exited the patrol vehicle and asked Defendant to exit his vehicle, which Defendant did from the driver's side.

---

[5]The trooper stated Defendant responded "that he was doing something on his cellphone and that he probably did" [Tr. at 12]. The trooper understood Defendant as agreeing that he had failed to maintain lane and explained to Defendant the new laws about texting and driving [Tr. at 12].

[6]Defendant objects to the testimony regarding Defendant's alleged nervousness while standing outside the vehicle on the grounds it is not credible and is refuted by the video of the traffic stop. However, as the Magistrate Judge noted, she did not consider Defendant's alleged nervousness as a factor supporting probable cause for the arrest or the search for the purposes of the motions to suppress, and neither will this Court consider the alleged nervousness of Defendant.

5

They stood in front of the patrol vehicle [Tr. at 14]. The trooper explained that he was issuing Defendant a warning, not a citation, and returned Defendant's documents to him, indicating to Defendant he was free to leave[7] [Tr. 14, 32, 34].

Trooper Moorman then asked Defendant if there was anything illegal in his vehicle, to which Defendant responded, "No" [Tr. at 14]. When Moorman asked for consent to search the vehicle, Defendant responded, "No" [Tr. at 15, 34]. Moorman explained he had a K-9 and was going to perform a "free air" search of the exterior of the vehicle. Defendant was not free to leave at that point [Tr. at 15, 35]. When Moorman deployed his K-9, beginning on the passenger side of the vehicle, the dog alerted to the driver's side door [Tr. at 15, 35].[8] Trooper Moorman returned his K-9 to the patrol vehicle and explained to Defendant that he had

---

[7]As Magistrate Judge King notes, the Government takes issue with Defendant's statement that he was "free to leave" [Doc. 39 at 19 n.6]. However, the Court agrees with the Magistrate Judge that under the rubric of the "whisper stop" and the understanding Defendant would have based on the objective facts as he knew them at the time, Defendant's belief at the conclusion of the traffic stop that he was free to leave is not "specious." The objective facts as known to Defendant would support such a conclusion.

[8]During cross-examination about the alert to the odor of narcotics in the vehicle, Trooper Moorman explained that odors circulate around in the vehicle and may escape the vehicle from a number of seams no matter where the drugs are located in the cab of the vehicle. [Tr. at 35-36]. Although the passenger side window may have still been open, because Defendant had recently exited from the vehicle by opening the driver's side door, that fact could explain why the K-9 alerted at that point [Tr. at 38]. Also, although the cocaine that had been in the bag had been replaced with sham cocaine, Moorman believed there could well be residual odor from the four kilograms of cocaine having been in the bag for a considerable amount of time and that "there is plenty of odor to cook out of that vehicle for the dog to sniff and to alert on" [Tr. at 36].

probable cause to search the vehicle [Tr. at 15]. Moorman found the bag on the front passenger floorboard and observed that it was locked. He asked the Defendant if the bag was his, and Defendant responded, "No" [Tr. at 15]. Moorman squeezed the bag, which was smooth-sided, and felt what he believed to be kilogram size packages inside [Tr. at 15]. He placed Defendant under arrest for violation of the Georgia Controlled Substances Act. He did not advise Defendant about the federal arrest warrant [Tr. at 16, 33-34]. A further search of the interior of the vehicle uncovered four to five cellular telephones and miscellaneous paperwork [Tr. at 16-17]. Homeland Security agents who were nearby then took custody of Defendant and of the evidence [Tr. at 17, 51-52].

After Defendant was transported to the Homeland Security office, Special Agents Harold Hawkins and Roy Rutherford and Task Force Officer Hoopingarner met with Defendant, who was being lodged in a holding cell [Tr. at 94-95]. The agents wanted to speak with Defendant but, having been advised that he had refused to consent to a search of his vehicle, doubted Defendant would talk to them. They did not advise him of his Miranda rights [Tr. at 95, 99]. Agent Hawkins, "merely asked him, you know, instead of reading his Miranda warning, I said, look, we have some questions we would like to ask you. However, you know, I don't think you want to talk to me, you probably want to talk to a lawyer or something to that effect or you don't want to talk to us, do you?" [Tr. at 95]. Defendant responded, "No, I would like to talk to a lawyer. I am in something over my head" [Tr. at 95]. At that point, the agent asked questions about where Defendant lived because they were aware that the address on Defendant's

7

license was a business, and they "were trying to ascertain where he actually resided so we could fill out some booking paperwork and other things" [Tr. at 95, 99]. The agents also wanted to ask for consent to search his residence [Tr. at 95, 99].

The agent asked if the information on Defendant's driver license was where he resided, and Defendant responded, "Yes" [Tr. at 96]. The agent then asked Defendant, "so that is where you sleep, you stay and sleep at a commercial business?" Defendant stated, "Yes" [Tr. at 96, 97]. Based on the investigation, Agent Hawkins knew Defendant had been observed at a residence located at 3737 Lake Enclave Way and at an apartment located on Lee Road in Lithia Springs. He asked Defendant for consent to search both of those residences, and Defendant responded, "How can I give you consent to search when I don't live there?" [Tr. at 96, 96-97]. After the agent advised Defendant about the arrest warrant out of St. Thomas, the conversation ended [Tr. at 96].

Some agents were then asked to go to 3737 Lake Enclave Way to conduct a knock and talk and to attempt to obtain consent to search the residence [Tr. at 53-54]. Special Agent Christopher Wright and Task Force Officer Gimwade, along with two Georgia State Patrol troopers in marked police vehicles, arrived at the residence at approximately midnight [Tr. at 53-55, 70]. Agent Wright knocked on the door several times, and after about four to five minutes, a woman answered the door, asking who they were [Tr. at 55-56, 70-71]. Agent Wright identified himself and presented his credentials [Tr. at 56-57]. He asked if the agents and troopers could step inside to speak with her, and she responded,

8

"come in." The woman, Ms. Harris, stepped back to allow the men inside [Tr. at 56, 73].

Once inside, Agent Wright explained they were at the residence as part of an ongoing drug investigation following a Georgia State Patrol traffic stop [Tr. at 57, 77]. Ms. Harris appeared surprised [Tr. at 57, 71]. Wright then asked Ms. Harris who lived in the residence, and she stated she was not married and lived there with her two children [Tr. at 57]. Task Force Officer Gimwade asked about Lincoln Son, and Ms. Harris stated he was the father of her nine year old son [Tr. at 57-58, 72]. Wright explained they would like to search the residence. Ms. Harris asked what the agents were looking for, and he responded, drugs, drug paraphernalia, and large amounts of currency [Tr. at 58].

Ms. Harris stated Defendant did not live in the residence but stayed there when visiting his son. When he stayed, he used a room at the top of the stairs [Tr. at 58, 71]. Ms. Harris appeared confused and asked if she was in any trouble, and Wright responded that "as far as [he] knew she hadn't done anything wrong." She did not want to allow a search of the entire residence and asked could she limit the search [Tr. at 58, 74]. The agent responded that she could ask them to leave at any time, and if she did so, they would leave [Tr. at 59]. When Ms. Harris asked if the agents had a warrant, Agent Wright responded clearly that they did not have a warrant and they were only in the house with her consent [Tr. at 59, 73]. Ms. Harris also stated she wanted to talk to a lawyer and was told that she could; however, Ms. Harris could only locate an office number. Due to the time of

9

night, she did not try to reach the lawyer and did not want to delay until she could do so [Tr. at 59, 6773].[9]

Ms. Harris was concerned that the agents were looking for drugs; she did not want anything harmful left in the residence [Tr. at 59]. She consented to a search of the room in which Defendant stayed when he visited the residence [Tr. at 59, 62]. Agent Wright presented Ms. Harris with a consent to search form, which he explained to her, and she signed [Tr. at 60, 62; Gov't Ex. C[10]]. The form provided in pertinent part:

> I have been informed of my constitutional right not to have a search made of my *residence* without a search warrant.
>
> I also have been informed of my right to refuse to consent to the *residence* being searched without a search warrant.
>
> I have been warned that anything discovered during such a search may be used against me in court or other proceedings.
>
> I hereby authorize Special Agents *Wright and other LEO* to conduct a complete search of *3737 Lake Enclave Way Atlanta GA* ~~located at~~ above and to take therefrom any letters, papers, materials, information, or other property which they may desire.
>
> I have given this authorization to the above Special Agent(s) voluntarily and without threats, promises, pressure, or coercion of any kind.

[Gov't Ex. C (italicized words handwritten on form)]. Before starting the search, the agent asked Ms. Harris who had access to

---

[9]At some point, prior to allowing the search, Ms. Harris left the agents and GSP troopers downstairs and went up to her bedroom to change her clothes [Tr. at 69, 77-78].

[10]The consent form was admitted into evidence during the May 17, 2012 Motion to Suppress Hearing before Magistrate Judge King. Although not available on the docket, the form is available from the Clerk's Office.

10

the room. She advised that Defendant did not live in the residence, that the house was hers, and that she had access to all of the rooms [Tr. at 63-64].[11] She explained the door to the room, although it had a lock, remained open and that she frequently entered the room to clean [Tr. at 64]. The door to the room was open when the agents went in to search [Tr. at 64].

Ms. Harris accompanied the agents to the room and stood in the doorway watching [Tr. at 62, 74-75]. Under the bed in the room, the agents found currency, a money counting machine and a box. When the lid of the box was opened, Agent Wright smelled the odor of marijuana. Inside the box was a vacuum sealer, and on the tray, he observed what appeared to be marijuana and cocaine residue [Tr. at 62-63, 76]. Ms. Harris observed the items and was confused as to what the items were. She was "very surprised" that the agents found the trace amounts of narcotics [Tr. at 63, 75]. Several pairs of men's shoes were also found under the bed [Tr. at 72]. In the dresser, Agent Wright found receipts for the purchase of a boat [Tr. at 63, 72]. The agents then requested permission to search other common areas in the residence to which Defendant had access. Ms. Harris agreed to the search of common areas, but did not allow a search of her or her children's bedrooms [Tr. at 64-65]. No additional items of evidentiary value were found [Tr. at 66].

Agent Wright stated he did not have any difficulty conversing with Ms. Harris and that she did not indicate she did not

---

[11]The property records indicated that a Kevin Robinson owned the home [Tr. at 98].

understand him [Tr. at 68]. Although she had been sleeping when the agents arrived, she did not appear afraid--just startled that they were at her residence [Tr. at 68]. She did not appear to be under the influence of drugs or alcohol, and she was coherent [Tr. at 69]. She never requested that the agents leave the residence [Tr. at 93].

II. Discussion

    A. Standard of Review

Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Criminal Procedure 59(b), the Court must conduct a de novo review of those portions of the R&R to which Defendant timely and specifically objected. The Court may accept, reject, or modify, in whole or in part, the findings and recommendations made by Magistrate Judge King. 28 U.S.C. § 636(b)(1); FED. R. CRIM. P. 59(b)(3); United States v. Raddatz, 447 U.S. 667, 673-74 (1980). The Court deems Defendant to have waived his right to request review of any portions of the R&R to which he failed to timely and specifically object. FED. R. CRIM. P. 59(b)(2).

    B. Defendant's Specific Objections

        1. Prior to the traffic stop, there was insufficient reliable evidence to establish Mr. Son took possession of bag

The Defendant argues no one witnessed, or testified to witnessing, the bag being placed in Defendant's car. The Defendant contends the over-the-radio communications heard by Trooper Moorman were unreliable hearsay and therefore insufficient to prove the basis for this warrantless stop. Not only does the Court find this argument to be unpersuasive, it is irrelevant to whether the state trooper had probable cause for the warrantless

12

stop. Trooper Moorman had probable cause for the initial traffic stop based on his observation of Defendant's violation of a Georgia traffic law, failure to maintain lane. United States v. Cooper, 133 F.3d 1394, 1398 (11th Cir. 1998) ("[L]aw enforcement 'may stop a vehicle when there is probable cause to believe that the driver is violating any one of the multitude of applicable traffic and equipment regulations relating to the operation of motor vehicles.'" (quoting United States v. Strickland, 902 F.2d 937, 940 (11th Cir. 1990))).

### 2. Both probable cause and reasonable suspicion were lacking at the time of the traffic stop

Defendant's objection to the traffic stop based on an informant tip is overruled because the trooper had probable cause for the stop based on his observation of a violation of a Georgia traffic law, failure to maintain lane. Cooper, 133 F.3d at 1398; Strickland, 902 F.2d at 940.

### 3. There was not probable cause to arrest Mr. Son or to search his vehicle

Defendant asserts there was no probable cause because: (a) the alleged nervousness of Defendant is disputed by the video evidence, (b) the dog could not have alerted to the suitcase since the cocaine had been removed and replaced with "sham" cocaine, and (c) the information that Defendant had taken possession of the suitcase was based on unreliable hearsay.

First, the Magistrate Judge specifically disclaimed reliance on the Government's testimony regarding Defendant's alleged nervousness. Since the Magistrate Judge did not consider this evidence, Defendant's objection to its consideration is irrelevant.

13

Second, Trooper Moorman testified that given the amount of cocaine removed from the suitcase, it was certainly possible there was sufficient residue for the dog to alert.

Third, as to the objection that without further corroboration the informant's information and the radio hearsay on the delivery of the suitcase was unreliable, the Court finds Trooper Moorman's observation of the very suitcase in Defendant's car, provides sufficient corroboration.

In addition, as the Magistrate Judge noted, "[o]nce the trooper observed the bag, which had contained the four kilograms of cocaine and now contained the sham cocaine, in the front floorboard of the vehicle, he had the necessary probable cause to search the vehicle" [Doc. 44 at 31]. The Trooper's actions as he followed through with the whisper stop are extraneous since he had probable cause both to search the vehicle and arrest Defendant based on his observation of the bag that had previously held the intercepted cocaine on the floorboard of his car.

Finally, the Court finds "[p]robable cause to arrest [Defendant Son] exist[ed] [because] the facts and circumstances within the collective knowledge of law enforcement officers, or of which they have reasonably trustworthy information, would [have] caused a prudent person to believe that the suspect has committed or is committing an offense." Craig v. Singletary, 127 F.3 1030, 1040 (11th Cir. 1997) (citations omitted). The Court reiterates Magistrate Judge Kings's findings on this point:

> Trooper Moorman also had reasonable suspicion, if not probable cause, to believe that Defendant was engaged in criminal activity at the time of the stop. When Trooper Moorman stopped Defendant, he knew the following information. An individual, whom the trooper had

14

observed earlier in the evening, had retrieved a bag, which the trooper had also observed, from an airplane at the Atlanta airport [Tr. at 7- 8, 20-21, 43]. That bag had contained four kilograms of cocaine and was intended to be delivered to Defendant Son, and the trooper was provided with a photograph of Defendant [Tr. at 7, 9, 12, 16]. At the time that the trooper observed the bag, DHS agents had removed the cocaine and substituted four kilograms of sham cocaine for the controlled delivery to Defendant [Tr. at 16, 21]. After the briefing with the agents, the trooper remained in contact with the agents conducting surveillance of the controlled delivery and was advised that the individual cooperating with the agents had contacted Defendant and arranged for the delivery of the bag at a restaurant located on Central Avenue and Camp Creek Parkway [Tr. at 8-10, 22, 24-26]. As the agents then observed in "real time" the meeting between the cooperating individual and Defendant, the trooper overheard the radio transmissions confirming that the meeting occurred, that Defendant was driving a silver Chrysler with Georgia tag number WX30WL, that Defendant took possession of the bag, and that the bag was placed into the vehicle driven by Defendant [Tr. at 9-10, 24-27, 33]. When Defendant left the meet location, agents conducted surveillance of his movements until the trooper was able to personally observe the vehicle and conduct the traffic stop [Tr. at 10-11, 26-28]. This information provided more than sufficient facts to establish a reasonable and articulable suspicion that Defendant was engaged in criminal activity, that is, a conspiracy to possess with intent to distribute a controlled substance or attempted possession of a controlled substance, even without consideration of any of the observations during the traffic stop. These facts justified not only the initial stop but the detention and questioning conducted during the traffic stop, including extending the length of the detention to allow the K-9 to conduct the open air sniff of the vehicle. The alert by the K-9 and the trooper's personal observation of the bag that he knew contained the sham cocaine delivered to Defendant by the cooperating individual provided, if needed, the necessary additional facts to establish probable cause for Defendant's arrest and the vehicle search. After stopping Defendant, the trooper approached the vehicle on the passenger side to speak with Defendant and as he looked in that window, he observed the bag that he knew contained the sham cocaine [Tr. at 11-12, 43]. This observation confirmed the information that had been relayed to him concerning the controlled delivery. And, although there is no evidence that Defendant looked inside the bag or that directly establishes that Defendant knew that he accepted delivery of a bag that was supposed to contain four kilograms of cocaine, the

15

> circumstantial evidence provides probable cause to arrest Defendant for a drug violation.

[Doc. 44 at 22-25 (footnotes omitted)].

    4.   <u>All statements made by Mr. Son after he invoked his right to counsel should be suppressed</u>

There is no dispute Defendant was in custody at the time of his statements about his residency, that he was not given a <u>Miranda</u> warning, nor that he in fact invoked his right to counsel.

The Magistrate Judge found the agents' questions regarding his address, residence at other locations, and consent to search fell within the "routine booking" exception to <u>Miranda</u>, and therefore were admissible not withstanding Defendant's invocation of his right to counsel. <u>See Pennsylvania v. Muniz</u>, 496 U.S. 582 (1990); <u>United States v. Sweeting</u>, 933 F.2d 962, 965 (11th Cir. 1991) ("An officer's request for routine information for booking purposes is not an interrogation under <u>Miranda</u> . . . .") (internal quotation marks and citations omitted).

Defendant's specific objection to the Magistrate's finding is that the Supreme Court has held that once an accused "express[es] his desire to deal with the police only through counsel," he may not be "subject to further interrogation by the authorities until counsel has been made available to him." <u>Edwards v. Arizona</u>, 451 U.S. 477, 484-85 (1981).

Where a criminal defendant's request for counsel is unequivocal, "all questioning must cease." <u>Smith v. Illinois</u>, 469 U.S. 91, 98 (1984). The invocation of the right to counsel is a "bright-line rule." <u>Arizona v. Roberson</u>, 486 U.S. 675, 681 (1988); <u>see also</u> <u>Solem v. Stumes</u>, 465 U.S. 638, 647 (1984) (noting the <u>Edwards v. Arizona</u> "right to be free from further questioning

16

once [defendant] invoked his right to counsel" is a "*per se* approach").

The determinative question, then, is whether the agent's questions about his residence and request for consent to search constituted an "interrogation" after Defendant invoked his right to counsel. The Court agrees with the Magistrate Judge's conclusion that the questions about Defendant's address and residence were "routine booking" questions and not an interrogation for Miranda purposes. Therefore the agent's questions about whether Defendant resided at the address on his driver's license, and Defendant's answer, "Yes," are ADMITTED. Likewise, given the agent knew the address was a commercial establishment, the follow-up question by the agent, "so that is where you sleep, you stay and sleep at a commercial business?" and Defendant's affirmative response, "Yes," are ADMITTED.

However, once the agents shifted into questioning him about other locations at which they had observed him, at which they thought he might stay periodically, and for which they wanted consent to search, the questions ceased being "routing booking" questions and became investigatory in nature. When the routing booking exception does not apply, the "bright line rule" announced in Edwards is that once the right to counsel has been invoked, "all questioning must cease." Roberson, 486 U.S. at 681; Smith, 469 U.S. at 98. Therefore, Defendant's statement, "How can I give you consent to search when I don't live there?" is SUPPRESSED.[12]

---

[12]The Court adopts the Magistrate Judge's finding that "No, I would like to talk to a lawyer. *I am in over my head*," was a spontaneous statement made by the Defendant not in response to any

17

5. <u>Mr. Son has standing to contest the search at 3737 Lake Enclave Way</u>

In order to challenge a search under the Fourth Amendment, the individual must show his "own Fourth Amendment rights were violated." <u>Rakas v. Illinois</u>, 439 U.S. 128, 138 (1978). To satisfy this, he must show he "maintains a legitimate expectation of privacy in the object of the search." <u>United States v. Hastamorir</u>, 881 F.2d 1551, 1559 (11th Cir. 1989). Although the Supreme Court has found an overnight guest can have a reasonable expectation of privacy in the home of another, Defendant here fails to "demonstrate a significant and current interest in the searched premises." <u>United States v. Garcia</u>, 741 F.2d 363, 366 (11th Cir. 1984).

Defendant points out he kept some personal items in the room searched and that his visits were for the personal reason of visiting his son. However, Defendant has failed to show any facts about how often he visited, how long he stayed when he visited, or even when he had visited last. The absence of these facts make the instant case that much more distinguishable from <u>Minnesota v. Olson</u> on which Defendant relies, because in <u>Olson</u> the defendant was actually present in the house when it was searched. 495 U.S. 91 (1990). The Defendant here was not only not on the property at the time of the search, he has also failed to show he had even been there recently. Defendant's evidence that he stayed at the residence "on occasion," therefore, is insufficient to show he had an expectation of privacy at the time of the search.

---

police questioning and is therefore admissible. (emphasis added).

6. The search of 3737 Lake Enclave Way and the third party consent were coerced

Like the Magistrate Judge, assuming arguendo Defendant had a reasonable expectation of privacy in the residence, the Court finds Ms. Harris' consent for the search of her residence valid. Defendant makes no colorable argument Ms. Harris did not have the authority to give consent to the search of her own guestroom. The door was not locked, she stated she regularly and freely entered the room, and the items seized were not in any type of locked container.

The Defendant argues that even if she had authority to consent, her consent was coerced. The Court disagrees. The Court adopts the findings of the Magistrate Judge, and, in particular affirms and reiterates the finding that Ms. Harris' eventual consent to a limited scope search was compelling evidence she was not coerced. After a prolonged question and answer with the agents in her living room, Ms. Harris consented solely to a search of the guest bedroom. After the agents found the currency and drug residue under the bed, she further consented to other common areas of the home, but still refused consent to search her bedroom or her children's bedroom. The Court, like the Magistrate Judge, finds Ms. Harris' exercise of her right to limit the scope of the search compelling evidence that Ms. Harris understood her rights regarding the search and was not coerced.

III. Conclusion

For the reasons above, Defendant's objections to the R&R [Doc. 44] are OVERRULED IN PART, and the R&R [Doc. 40] is ADOPTED IN PART and REJECTED IN PART. As a result, Defendant's motion to

19

suppress statements made in custody [Doc. 29] is GRANTED IN PART and DENIED IN PART, and Defendant's motions to suppress evidence from the warrantless traffic stop and to suppress evidence from the warrantless search of a residence [Docs. 27 & 28] are DENIED.

SO ORDERED this 2 day of October, 2012.

_____
ORINDA D. EVANS
UNITED STATES DISTRICT JUDGE